## MADDOX, ET AL., V. NEAL, ET AL.

45   121
63   439

1. COMMON SCHOOLS: *Mandamus to compel directors to provide schools.*

It is the duty of the directors of a school district to provide equal school facilities for the blacks and whites. They cannot claim to apportion the school funds and limit the school terms to each class according to their scholastic population; and when but a few days more than three months are left of the scholastic year, and they show no intention to provide a school for that time, they may be compelled to do so by mandamus. (Eakin, J., dissenting:—holding that the directors may, in their discretion, apportion the funds according to the scholastic population of the classes.

2. MANDAMUS: *When will issue.*

  The writ of mandamus will issue whenever the refusal or failure of an officer to act in a matter in which it is his plain duty to act, may deprive one of a legal right.

3. MANDAMUS: *Parties.*

  The parents of children of scholastic age are proper parties to a petition for mandamus to compel the directors of a school district to establish schools.

APPEAL from *Crawford* Circuit Court.

Hon. R. B. RUTHERFORD, Circuit Judge.

*Clark & Williams* for Appellants.

COCKRILL, C. J.   The appellants petitioned the circuit court for a writ of mandamus to compel the directors of a common school district to provide a school for the education of their children.   There are nine of the petitioners and they sue on behalf of all others in the district in like situation.   They represented to the court that they were negroes, residents of the district and the parents of about forty children of scholastic age ; that two school houses had been provided for the district in accordance with the requirement of the statute, one for the white and one for the black children ; that a school had been maintained for the whites during the scholastic year for a term of three months, but none had been provided for the blacks ; that there was money in the treasury to the credit of the district subject to use for teachers' wages ; that the school for the whites had closed for the year and that the directors had neglected and refused to hire a teacher for the blacks.   There was, at the time of presenting the petition, a little more than three months of the scholastic year unexpired, and the petitioners prayed that the directors be compelled to employ a teacher to keep the negro school for a term equal to that already maintained for the whites, that is, a term of three months.

In their answer the directors do not undertake to controvert the state of facts made by the petitioners, but allege only that

there were at the last enumeration 105 white and 40 black children of scholastic age in the district, and that they conceived it to be their duty to apportion the school funds of the district between the two races in proportion to their number by dividing the funds in dollars *per capita* among all the children, and then to hire teachers, for each race, for such time as the money so apportioned would justify; that they had proffered to do this much for the petitioners and were still willing to do it, but that their offer having been declined, and a demand made by the blacks for a term of school equal to that provided for the whites, no school had been provided for them. It appears also, that no school had been provided for them the previous year for the same reason.

The case was submitted to the court on the petition, and answer and an affidavit substantiating the facts set forth; the court dismissed the petition at appellants' costs and they prosecuted this appeal.

Education in this state is a matter of governmental concern. The constitution declares that "the state shall ever maintain a general, suitable and efficient system of free schools, whereby all persons in the state between the ages of six and twenty-one years may receive gratuitous instruction." The duty is imposed upon the general assembly of providing by general laws for the support of this system by means of a state tax upon all taxable property, as well as by a general poll-tax, and a special tax to be levied by the districts at their discretion. *Art. 14, Secs. 1 and 3, Const. 1874.*

Under these provisions the legislature has organized a system of common schools, and have adopted such regulations in reference thereto as in their judgment, to use the language of the statute, will be most "expedient for carrying the free-school system into effectual and uniform operation throughout the state, and providing as nearly as possible for the education of every youth." *Mans. Dig., Sec. 6212.* In pursuance of this

policy the several counties outside of cities and towns are divided into school districts, and the school affairs and educational interests of the districts are confided to boards of directors to be chosen by the qualified electors in their annual school meetings. A wide range of discretion is vested in these boards by the statute in the matter of the government and details of conducting the common schools, but in the nature of things, there is a limit to this discretion. Some positive and imperative duties are imposed upon them about which they have no discretion. The first and most important duty of the board is to make provisions for establishing schools. Without schools there could be no school system, and the directors cannot dispense with the system. When the funds are provided and the directors are not otherwise instructed by the school meeting of the district, the duty to provide a school for at least three months is mandatory, and the duty to establish separate schools for the whites and blacks is also incumbent on them. All the provisions of the law in relation to schools, in conformity to the constitutional mandate, are general, and the system, as far as the statute can make it, is uniform. No duty is imposed upon, or discretion given to the directors about schools for one race that is not applicable to the other. It is the clear intention of the constitution and statutes alike, to place the means of education within the reach of every youth. Education at the public expense has thus become a legal right extended by the laws to all the people alike. No discrimination on account of nationality, caste or other distinction has been attempted by the law-making powers. The boards of directors are only the agents, the trustees appointed to carry out the system provided for. Their powers are no greater than the authority conferred by legislation. They can do nothing they are not expressly authorized to do or which does not grow out of their express powers. In treating of this subject a learned author says: "The general principles of constitutional aw undoubtedly govern the directors' actions as

they do the actions of higher authorities, and whatever would violate those principles would be an excess of power on their part." *Cooley Torts, 289.* The opportunity of instruction in the public schools, given by the statute to all the youths of the state, is in obedience, as we have seen, to the special command of the constitution, and it is obvious that a board of directors can have no discretionary power to single out a part of the children by the arbitrary standard of color, and deprive them of the benefits of the school privilege. To hold otherwise would be to set the discretion of the directors above all law. If they may lawfully say to one race you shall not have the privilege which the other enjoys, they can abridge the privileges of either until the substantive right of one or both is destroyed. The separate education of the two races in accordance with the terms and spirit of the law is no wrong to either. In the absence of express legislation on the subject, the directors might have provided for this under their general powers. *Union County v. Robinson, 27 Ark., 116; Hall v. De Cuir, 95 U. S., 504; Roberts v. Boston, 5 Cush., 198; Ward v. Flood, 48 Cal., 36; State v. McCann, 21 Ohio St., 198.*

But it is universally held that this discretion cannot be exercised so as to produce undue inequality in the educational advantages offered. *Authorities sup.; U. S. v. Buntin, 10 Fed. R., 730; Claybrook v. Owensboro, 16 Ib., 297.*

The appellants do not seek to question this general power. They have not sought to regulate the manner in which the privilege is to be enjoyed. The object of their petition was not to compel a distribution of the school fund upon any given basis between the two races, or to have a disbursement of any particular amount in their favor. These matters are within the control of the directors so long as their discretion is legitimately exercised within the purview of the statute. In this case it was made manifest that all the prerequisites to the performance of a plain legal duty by the directors existed. Their

1 SCHOOL DI-RECTORS must provide schools.

answer admits their ability to employ a qualified teacher. It was shown that they had sufficient means to pay the expenses of the school; that only a few days more than three months in the scholastic year were left, and that they had no intention of providing a school for that period. Under these circumstances we have seen there is no discretion in the directors to reduce the school to a less term, and at this time there was no longer room for the exercise of a discretion as to when the term should begin. The directors could not divert the issue from their failure of duty, by suggesting a willingness to distribute the funds evenly among all the children. The necessity to provide for the schools was apparent, and they were as plainly commanded by the statute to provide for the blacks as for the whites. This statutory duty they could not escape, but in the discharge of it they would be left to determine the amount necessary to sustain each. It is not pretended that the distribution suggested would maintain a three months' school for the smaller number. An abuse of discretion in discharging this duty would not be corrected by *mandamus*. Nevertheless, officers who are thus backward in the performance of a duty may properly be set in motion by *mandamus*. *High Ex. Rem., Sec. 32.* The fact that certain incidents and details of the duty to be performed are within the discretion of the officers is no objection to starting the performance of the duty itself. *Hutt, ex parte, 14 Ark., 368; McCreary v. Rogers, 35 Ark., 298; Trapnell, ex parte, 6 Ark., 9; High Ex. Rem., Sec. 413.*

2. MANDAMUS: When writ will issue. The writ will issue whenever the failure or refusal of officers to act in a matter in which it is their duty to do so is plain, may deprive one of a legal right. *McCreary v. Rogers, sup.; Hays, ex parte, 26 Ark., 510.*

In *Corey v. Carter, 48 Ind., sup.,* it is said if a school trustee fails in his duty to provide educational means, *mandamus* will lie to compel him. A petition for *mandamus* against a like trustee to compel him to establish a school for the blacks was

denied in the case of *State ex rel. Oliver v. Gruff, 85 Ind., 213,* but the decision is put expressly upon the ground that the petition did not show that it was practicable to maintain such a school, inasmuch as there was not a sufficient number of black children in the district to constitute a separate school. The case is in point and authority to sustain the petition here. See, too, *Gilman v. Bassett, 33 Conn., 298.*

The interest of the petitioners and their consequent right to insist upon the performance of the legal duty come from their relationship to the infant children. "The father," says Judge Cooley for the supreme court of Michigan, "is the natural guardian for the child, charged with his nurture and education, and having a personal duty to perform in respect thereto. Although the proceeding is for the benefit of the child, the duty of placing him in school is the parent's, and the father is entitled on his own behalf to appeal to the courts for the removal of any unlawful impediments." *People ex rel. Workman v. Board of Education, 18 Mich., 460.* Many of the reported cases of this character have proceeded upon the same principle. *Corey v. Carter, sup.; Bertomean v. Directors, 3 Wood., 177; State v. McCann, sup.; People v. Gaston, 13 Abb. Pr. (N. S.), 160.*

3. Parties to petition.

The circuit court erred in refusing the relief sought, and the judgment must be reversed.

The mandate cannot now, however, serve the purpose desired, that is, compel the employment of a teacher for the scholastic year now about to expire. Courts never award process for a futile purpose. The petitioners are entitled to their costs, however. The judgment will be reversed and the cause remanded, with instructions to dismiss the petition at the costs of the board, with leave, however, to petitioners to reinstate during the scholastic year, if a similar state of case should be presented, when the court will proceed in accordance with this opinion.

EAKIN, J. *Dissenting.* The appellants are colored men, who, on behalf of themselves and others of their race, residing in school district No. 56, of Crawford county, applied to the circuit court for a writ of *mandamus* to the school directors, to compel them to employ a teacher for the colored children of the district for an equal time with that for which a teacher of the white children might be employed. They say that they are residents of the district, and show by an affidavit filed that they had in the aggregate about forty children of scholastic age at the last enumeration.

The petition was answered by the directors. There is no contest as to the facts, which are as follows:

The district has two school houses, one for the white and the other for the colored children. At the enumeration made in 1883, there were, of scholastic age, in the district, one hundred and three white and twenty-two colored children. There were, when the petition was filed in March, 1885, one hundred and five white and forty colored children. In July, 1883, the directors employed a teacher of the colored children for a term of two months, and none since. Meanwhile there have been three terms of the white school for three months each. The directors, in their response, say that they conceived it to be their duty under the law to apportion the school fund *per capita*, and employ teachers for each school as the *pro rata* of each would suffice; and that they are willing to do the same still, but inasmuch as it has never been satisfactory to the colored population, and they have declined to accept a teacher on those terms, they have not employed one for the present year. The district has now, in the county treasury, to its credit, the sum of $147.57 left from the funds for payment of teacher's wages for the past fiscal year.

An alternative *mandamus* was issued, which, upon answer and hearing, the court declined to make peremptory, and the petitioners now appeal here.

By law the school directors have the general charge of school affairs and of the educational interests of their districts. *Mansf. Dig., Sec. 6213.* It is their duty to make contracts with teachers, specifying the time for which they may be employed and monthly wages; and to visit the schools, encourage the pupils, and advise the teachers. *Ib., 6214, 6218.* Within the limits of their powers, and under the general guidance of the statute, they must, in many matters, be invested with a considerable range of discretion, and it is supposed in the small circle of the districts they will be selected with a view to their interest in the education of the children of themselves and their neighbors, and to their fitness and disposition to discharge their duties in a discreet, fair, and, as it were, paternal manner. The trust of selecting such is committed to the voters, who should have the interests of the children most at heart; and if the voters neglect their duty in this regard the courts can only regret it, and confine themselves to the enforcement of those duties which are made specific, and the restraint of such acts as may be unauthorized or forbidden. The only section of the statute bearing upon the point before us is *6212, Ib.* It directs that the board of directors "shall *make provision* for establishing separate schools for white and colored children and youths, and shall adopt *such other measures as they may judge expedient* for carrying the free school system into effectual and uniform operation throughout the state, and providing *as nearly as possible* for the education of every youth." Here is a general purpose committed to their best discretion, to be carried out by such means as they may deem expedient in accordance with specific directions of law.

There is nothing in the section of a specifically mandatory nature. Its whole language imports a reliance upon their discretion in detail, with a view to a general purpose.

It is absolutely impossible, and especially so in the newer states, that any common school system should offer *precisely*

the same advantages to every child. The greatest good to the greatest number is all that can be hoped. In deference to the sentiments of both races, the legislature has empowered the directors to make a distinction between the children of different races, for purposes of education, without indicating a preference to be extended to either. In some districts, as in this, the white children largely preponderate. In others the colored children are more numerous. A uniform system of using the fund *pro rata* according to numbers may not be the wisest that the directors could devise for each district, but it would certainly operate impartially as to race. We cannot say it is not, indeed, the best. About that there might be difference of opinion. For where there might be a great number of children of one race, either white or colored, and but two or three of the other, it would be a sad waste of limited educational means to make an equal division of them, and keep up schools for each at the same expense and for the same time. The education of scores of children, with all its diffusive benefits upon the coming generations, might be cut off by this Procrustian system, in order that two or three might enjoy fancied abstract rights. It is not plain that this is in accordance with the practical philanthropy of the age or with the state policy which fosters education with a view to an enlightened citizenship, widely diffused, as the surest bulwark of civil liberty. But if the legislature means that this system should prevail, it should make provisions to carry it into effect by mandatory and specific directions in the common school system. It would be easy to say that schools for the different races should, regardless of numbers, be maintained in each district for the same time and at the same expense. If the legislature has not so ordered, and we cannot see that it has, then it transcends the judicial function to do so by writ of mandamus. This writ depends upon positive ministerial duties, prescribed by common or statute law.

Doubtless it comes within the discretion of the directors to divide the funds as sought. But mandamus does not lie to control discretion. There are other remedies to direct, restrain and control persons in fiduciary positions. The directors are not refusing to *act*. They have been proceeding according to their own views of duty, and are willing to go on, but petitioners refuse to accept any advantage under their proceedings.

Courts of equity have authority, by restraining orders and mandatory injunctions, to prevent the abuse or enforce the execution of trusts—if there be any such case presented.

The common law writ of mandamus should not be used except to compel the performance of a specific, well defined legal duty, about which there can be no discretion, and performance of which is refused. The use of the writ in such cases as this destroys, and confuses, its distinctive nature.

If the duty sought to be enforced were definite, and could be specifically ordered, still it is a public duty, of public officers; and in such cases the settled rule, elsewhere, is that the writ cannot be impetrated at the suit of individuals having an interest in common with other citizens that the duty be discharged. (*Cooley's Blackstone, Note 2, p. 110, Vol. 3.*)

This distinction, however, regards form, and would not of itself be insisted upon; as it seems in some cases to have been disregarded in former decisions, still, it is better that the old principles should be maintained.

If the duty be plain and palpable (and without it mandamus will not lie,) then the directors, if they have violated it, are liable, each, to a forfeiture of twenty-five dollars, which any elector may recover for the use of the school fund; or the prosecuting attorney for the district may take the matter in hand, and institute proceedings not only to bring offending officers to trial, but such as may be necessary to secure to the district,

or to any person damaged by violation of the law, benefits and reliefs to which each or any of them may be entitled. *Mansf. Dig., Secs. 6209, 6257.* The writ of mandamus I think neither necessary nor proper.