# No. 14,324.

## MONTGOMERY *v.* CITY AND COUNTY OF DENVER ET AL.
### (80 P. [2d] 434)

Decided May 31, 1938.

Mr. BERNARD J. SEEMAN, Mr. MYLES P. TALLMADGE, for plaintiff in error.

Mr. MALCOLM LINDSEY, Mr. GLENN G. SAUNDERS, Mr. ROBERT J. KIRSHWING, Mr. NEIL HORAN, for defendants in error.

Messrs. PERSHING, NYE, BOSWORTH & DICK, amicus curiae.

*En Banc.*

MR. JUSTICE KNOUS delivered the opinion of the court.

ON December 13, 1937, the city council of Denver adopted by a two-thirds vote, the mayor approved, and there now is in full force and effect, ordinances 87 and 88, series of 1937, respectively levying on all taxable property within the city a general tax of 1.409 mills on the dollar, upon the total assessed valuation for the year 1937, and appropriating the proceeds of said levy, amounting to $450,528.52, for the purpose of paying and redeeming special improvement district bonds falling due during the year 1938 and the interest thereon, which have heretofore been issued in the name of the city to pay for the construc-

tion and installation of improvements in numerous special improvement districts within the city of Denver and for which redemption sufficient funds would not otherwise be available, although by their terms such bonds and the interest thereon were to be paid by assessments on specially benefited property in the various districts. Thereafter the plaintiff in error, to whom we shall refer as plaintiff, who had paid the first half of the 1937 tax under protest, as a taxpayer instituted this action for himself and all others similarly situated, to secure a declaratory judgment that such general tax be held invalid on constitutional grounds and because in conflict with certain charter provisions, and sought a refund for himself and those similarly situated, of taxes paid and to be paid under said levy. The city filed a cross complaint and answer. Its first defense consists of admissions of substantially all of the alleged facts and a denial of plaintiff's conclusions as to the invalidity of the levy. A second defense, originally included, was later stricken by consent of the city. By the third defense and cross complaint the city seeks a declaratory judgment to validate a proposed issue of bonds to refund all of its outstanding special improvement district bonds and a judicial determination on a number of other questions, among which are:

1. Whether or not the city is obligated to return to taxpayers moneys heretofore paid by them in previous years and under similar ordinances and used by the city in payment of special improvement district bonds.

2. Whether or not the determination of the question submitted in the preceding clause is in any way affected by failure of the taxpayer to pay his taxes under protest.

3. Whether the city treasurer, if he deems it prudent to so do and has reasonable grounds for such belief, may cause outstanding special improvement district bonds in the principal amount of about $4,000,000 to be called for redemption whether or not funds are actually in his hands to redeem the bonds called.

4. Whether the city has power to refund all or any of

the outstanding special improvement district bonds unaffected by the status or payment of the assessment or assessment funds which are a lien for the payment of the outstanding special improvement district bonds of the city.

5. Whether the issuance of special improvement bonds of the city is dependent upon a vote of the taxpaying electors of the city.

The trustees of the George W. Clayton Trust Commission and the board of trustees of the Firemen's Pension Fund, the owners of special improvement district bonds of the city, maturing in the year 1938, were joined below as parties defendant upon the application of plaintiff and appeared and joined in the answer and cross complaint filed by the city. The plaintiff moved to strike the city's third defense and cross complaint on the ground that it did not state facts sufficient to constitute a cause of action arising out of the transaction set forth in plaintiff's complaint, and that it did not state facts in any way connected with the subject of the action. Upon the overruling of this motion plaintiff demurred to the third defense and cross complaint on the grounds stated in the motion, and the additional grounds that such defense and cross complaint did not state facts sufficient to constitute a defense to plaintiff's cause of action or a cause of action against the plaintiff. This demurrer also was overruled and plaintiff filed replies to the first and third defenses and cross complaint, the original second defense having in the interim been withdrawn. A demurrer upon the same grounds as previously asserted was overruled and upon a brief stipulation of facts, which we shall hereinafter mention, the cause was submitted for determination on the merits. The trial court held that the tax levy was not void or unconstitutional, but found that the relief prayed for by the city in the third defense and cross complaint, other than that which relates to the mill levy in controversy, was based upon speculative matters which are premature and which merely seek advice on what may or may

432

not be controversies as contemplated by the declaratory judgment act and are not proper subjects of judicial consideration in this condition, because of which the relief prayed for in the third defense and cross complaint was denied.

 Some uncertainty seems to exist in the minds of counsel with reference to the effect of the trial court's holding on the third defense and cross complaint last mentioned. Notwithstanding, it seems clear that the trial court intended to sustain such parts of the third defense and cross complaint as relate to the tax levy in question, and denied relief on all the extrinsic matters therein alleged. We believe the trial court was right in its conclusion and that it might well have sustained either plaintiff's motion to strike or his demurrer to this portion of the pleadings of the city as the allegations of the complaint relative to the involved tax were put in issue by the first defense. This third defense and cross complaint are vulnerable to the objections presented upon at least two grounds: First, the matters pleaded did not arise out of the transaction set forth in the complaint and were not connected with the subject of the action as required by section 63 of the Code. *Wyman v. McCarthy,* 93 Colo. 340, 26 P. (2d) 245; *Modrell v. Crews,* 100 Colo. 415, 67 P. (2d) 1036. Second, the judicial declarations requested by the city under this pleading, assertedly by authority of the declaratory judgment act, definitely come within the classification of speculative inquiries not covered by the act and of which we said in *Gabriel v. Board of Regents,* 83 Colo. 582, 267 Pac. 407: ''We cannot here decide any other of the various questions raised, however desirable it might be to have them settled, unless we are now willing to answer questions 'which have not yet arisen and which may never arise' and reply to mere 'speculative inquiries.' We cannot thus permit the courts to be converted into legal aid bureaus.'' To the same effect is the case of *Mulcahy v. Johnson,* 80 Colo. 499, 252 Pac. 816.

 As may be gathered from our brief statement

of the relief sought by the city in this connection, we are asked to determine the validity of certain proposed refunding bonds with reference to which no ordinance has been adopted or even introduced. In *Denver v. Denver Land Co.*, 85 Colo. 198, 274 Pac. 743, it was held that a declaratory judgment may not issue as to the validity of a city ordinance to create a storm sewer district where the proposed ordinance is in contemplation only and has not been passed by the city council. We also are asked to determine the status of possible refunds to taxpayers of taxes paid in previous years and under different ordinances than those here involved and to announce the legal effect of the payment of such taxes under protest without the presence of any of the taxpayers as parties to this proceeding. Such a declaration is without the purview of the act. *Denver v. Denver Land Co., supra.*

In the complaint as filed, as to the asserted reason for the deficiency of funds with which to pay special improvement district bonds maturing in 1938, it was alleged that the city failed and neglected to advertise and sell property, owners of which were delinquent in the payment of special assessments, as commanded by section 40 of the city charter, 1937 compilation; and as one of the grounds of the alleged invalidity of the questioned mill levy it was alleged that such levy was in excess of the 15 mill tax limit fixed by the city charter and particularly section 190 thereof. By the stipulation of facts herein the parties agreed that no issue would be raised as to the two questions last mentioned and consequently they are not before us for determination. With these various extrinsic matters eliminated the controlling question for determination is whether the 1.409 mill tax levied by the city is a valid and constitutional tax.

Section 48 of Denver's charter reads as follows: ''Where all outstanding bonds have been paid in a public improvement district, and any money remains to the credit of said district, it shall be transferred to a special surplus and deficiency fund, and whenever there is a defi-

ciency in any improvement district to meet payment of outstanding bonds, it shall be paid out of said fund. Whenever a public improvement district has paid and cancelled four-fifths of its bonds outstanding, and for any reason the remaining assessments are not paid in time to take up the final bonds of the district, and there is not sufficient money in said special surplus and deficiency fund, then the city shall pay said bonds when due and reimburse itself by collecting the unpaid assessments due said district.''

Although it is not directly alleged, it inferentially appears from the allegations of the complaint and the admissions in the answer that the tax levy here in issue was made for the purpose of paying principal and interest of bonds of districts, some of which had, and some of which had not, paid four-fifths of the bonds originally issued. The plaintiff contends that there is absolutely no authority for the payment by general tax of bonds in districts which have not paid four-fifths of their outstanding bonds and that section 48, supra, providing that the city shall pay bonds of districts which had paid four-fifths of the bonds outstanding contravenes sections 1 and 8 of article XI and section 1, article XX of the Constitution as well as section 206 of Denver's charter.

As to districts in which eighty per cent of the bonds outstanding have been paid and cancelled, the city primarily seeks to justify the tax levy on the basis of section 48, supra, and, secondarily, upon the general powers to be next discussed. As to districts in which four-fifths of the original bond issue has not been discharged, the city claims its authority to levy a general tax for the purposes here involved rests upon the exercise of its powers to preserve and enforce good government, general welfare and security of the City and County of Denver and its inhabitants as conferred by article XX of the Constitution and Denver's charter. It is argued that Denver might pay for all or any part of a public improvement out of general revenue in the first instance; and as a corollary it follows that

the city council in the exercise of its plenary legislative power in all matters of local and municipal nature, without the necessity of a vote of the taxpayers, and, in effect, without constitutional or charter restraint, may pay any part of the cost of a public improvement, whether that part be paid at the time of the installation of the improvement or at some later time. For the purpose of invoking the doctrine of administrative interpretation, the city calls attention to the fact that for many years the practice here under consideration in connection with the payment of special improvement district bonds has been followed. Further, while none of the improvement bonds to be paid by the proceeds to be derived from the questioned levy have been guaranteed by the city, in support of its contention on the issue under consideration, and as indicative of its wide authority, it is pointed out that section 46 of the charter authorizes a guarantee of payment by the city of local improvement district bonds where such authorization is sanctioned by a two-thirds vote of the city council. A statute of similar import as applied to a city organized under the general statutes, was declared unconstitutional in the case of *Aurora v. Krauss,* 99 Colo. 12, 59 P. (2d) 79, on the ground that it transgressed sections 1 and 8 of article XI of the Constitution. We do not determine, as the unguaranteed status of the bonds here warrant, to what extent, if at all, the authority to guarantee conferred upon the officials of Denver by its charter, when taken in connection with its peculiar position under article XX of the Constitution, and particularly section 6 thereof, is controlled or affected by *Aurora v. Krauss, supra,* and in connection with the argument on this point shall consider the authority conferred by charter section 46, supra, as being unimpaired thereby.

The city cites no specific authorization, ambiguous or otherwise, either under article XX of the Constitution or its charter, for the general power it is attempting to exercise in this connection and the only provisions therein which relate to the subject impose a limitation

436

upon the city's rights in the premises. Under these circumstances, the doctrine of administrative interpretation is not available. *People ex rel. v. May,* 9 Colo. 80, 10 Pac. 641; *People ex rel. v. Hinderlider,* 98 Colo. 505, 57 P. (2d) 894.

■ Such an assumed authority is entirely inconsistent with the very spirit of Denver's charter and the Twentieth Amendment, in that if such general power reposes in the council by virtue of either, there would have been no justification or necessity for inserting therein section 48 limiting the obligation of the city for the payment of special improvements from general funds to twenty per cent of the amount of the original bond issue, and that upon the express condition that eighty per cent of such bonds shall have been first retired by funds derived from special assessments paid by taxpayers of the district. Further, and without relation to its validity, there would have been no purpose in expressly conferring upon the council authority by a two-thirds vote of its members to guarantee special improvement district bonds if the inherent power to discharge such bonds from general funds reposed in the council in any event. We are confident that the Denver city council, at least in the case of bonds not guaranteed and except as may be permitted by section 48, supra, has no general authority as a matter of public welfare or otherwise, to levy a general tax to pay defaulted portions of special improvement district bonds, and, therefore, must conclude that in so far as the levy under consideration is devoted to the payment of such bonds or interest thereon in districts which have not discharged eighty per cent of their outstanding bonds, it was unauthorized.

■ ■ Passing now to a consideration of section 48 of the charter and the validity of the portion thereof authorizing payment by the city of the balance of special improvement district bonds of districts in which eighty per cent of the outstanding bonds have been retired. As has been indicated, it is contended that so much of said

section as contemplates the payment of local improvement district bonds out of the general funds of the city or funds resulting from a general tax levy, violates section 1 of article XI of the Constitution, which prohibits a city from lending or pledging "the credit or faith thereof, directly or indirectly, in any manner to, or in aid of, any person, company or corporation, public or private, for any amount, or for any purpose whatever;" or becoming "responsible for any debt, contract or liability of any person, company or corporation, public or private, in or out of the state." We do not believe the section so transgresses. Section 44 of the Denver charter provides: "All local improvements shall be paid for in public improvement bonds of the City and County * * * payable only out of the moneys collected on account of the assessments made for said improvements respectively." In Denver, improvement bonds are issued under an improvement ordinance. The improvements are completed and the bonds sold prior to the time assessments are made on any particular parcel of property, such assessments in some instances being levied as much as two years after the bond issue. There is no certainty at the time a Denver public improvement bond is issued that any particular property or person ever will be called upon to pay an assessment to liquidate the bonds. The creation and discharge of the lien for special assessments is one thing, and the obligation of the city respecting payment of special assessment bonds, is quite another. Regardless of whether or not bonds are paid, payment by the owner of the special assessment levied against his property discharges any lien that might exist by reason of such assessment. In no manner can a bond-holder hold such a taxpayer liable for the payment of the bonds. The entire obligation of the special assessment is *to* the City and County of Denver and the entire obligation under the bond to the extent provided, is that *of* the City and County of Denver.

The status of the city with respect to local im-

provement district bonds is defined in Dillon on Municipal Corporations (5th ed.), volume 2, section 893, where it is said: "Although such obligations do not constitute debt of the municipality in the constitutional sense of the word, or an obligation which is payable from its general funds, yet bonds which are issued in the name of the municipality, to be paid only from a special fund created by the enabling act and so limited on the face of the obligation, are the bonds of the municipality."

An improvement district created under the charter of the City and County of Denver is neither a person, company or corporation, public or private, within the meaning of section 1, article XI of the Constitution. It has no local existence as a separate entity and is without officers, powers or existence and cannot sue or be sued. It is merely a geographical division created by the municipality for convenience in the construction of public improvements. Manifestly, therefore, since the bonds contemplated by this provision are the bonds of Denver, the people of Denver in voting section 48 into their charter provided for no donation or lending of credit within the meaning of section 1, article XI of the Constitution. In this connection we are not unmindful of the language of the opinion in *Aurora v. Krauss, supra,* with respect to the status of the obligation created by the improvement district bonds there under consideration, but whatever that situation, the law there announced cannot be applied in the case of Denver.

It is further argued that section 8, article XI, section 1, article XX of the Constitution, and section 206 of the charter would be violated by the proposed assessment, upon the theory that the obligation of the city imposed by section 48, supra, to pay twenty per cent of special assessment bonds under the conditions prescribed involves the creation of an indebtedness which must be authorized by the taxpaying electors at an election under these constitutional and charter provisions, and no such election has been had.

The legality of no outstanding special improvement bond of Denver is challenged by this proceeding, the question of the necessity of approval by the taxpaying electorate being raised solely with reference to the conditional obligation charged by section 48, supra. This section, above quoted, authorizes the creation of a surplus and deficiency fund, to which surpluses in improvement district funds may be transferred, and it provides that whenever a public improvement district has paid out and cancelled four-fifths of its outstanding bonds and there is insufficient money in this fund to pay the remaining bonds, then the city shall pay such bonds when due and reimburse itself by collecting the unpaid assessments due the district. It will be observed that this provision contemplates only a temporary advance to the surplus and deficiency fund from the general funds of the city with provision for the complete remuneration of the city as and when the special assessments are collected.

We apprehend that it is impossible to mathematically determine with certainty at the time improvement district bonds are issued, or even when the assessments are made, the precise condition in which the bond redemption fund of such district will be when the final bond becomes due. Doubtless in some districts a surplus will remain after full payment, while in others the fund will be insufficient for the purpose. It also is well known that if special assessments exclusively are used to retire such bonds, under average conditions, a certain percentage of the bonds with late maturity dates are not redeemed when due. Naturally, these circumstances have a direct bearing on the amount realized by the city from the sale of such bonds to the investing public.

Doubtless, we believe, with these conditions in mind, coupled with the definite conviction that a large amount of money must be expended for public improvements if their city was to progress as it has, the Denver electorate adopted the charter provision in question. It would seem that the arrangement so provided with respect to these

matters is sensible and proper and likely has proved highly beneficial to the people of Denver, including the general taxpayer, by making it unnecessary for the city to sell improvement district bonds at greatly depreciated prices.

With respect to any given bond issue there is no certainty that the city will ever be called upon to make advances to the surplus and deficiency fund, and if it should be, provision is made for reimbursement. In *Johnson v. McDonald*, 97 Colo. 324, 336, 49 P. (2d) 1017, we quoted with approval from *Seward v. Bowers*, 37 N. M. 385, 24 P. (2d) 253, the following, which we said "clearly defines a debt in the constitutional sense." "The idea of a 'debt' in the constitutional sense is that an obligation has arisen out of contract, express or implied, which entitles the creditor unconditionally to receive from the debtor a sum of money, which the debtor is under a legal, equitable, or moral duty to pay without regard to any future contingency."

Under these circumstances we must conclude that section 48 in authorizing payment by the city of deficiencies in bond payments does not create a debt within the meaning of that word as used in section 8, article XI of the Constitution, if this section at all applies to Denver; nor does it amount to the issuance of bonds or the creation of a loan within the meaning of section 1, article XX of the Constitution or section 206 of the charter, and hence is violative of none of these because of the fact that such payments have not been approved by the taxpaying electorate.

Generally, similar statutes involving the advancement of general funds to meet delinquencies in special assessments for local improvements have been declared constitutional in many states. *Comfort v. Tacoma*, 142 Wash. 249, 252 Pac. 929; *Wicks v. Salt Lake City*, 60 Utah 265, 208 Pac. 538; *American Company v. City of Lakeport*, 220 Cal. 548, 32 P. (2d) 622; *Stanley v. Jeffries*, 86 Mont. 114, 284 Pac. 134.

On the point here involved the case at bar is distinguishable from *Aurora v. Krauss, supra,* and *Deter v. Delta,* 73 Colo. 589, 217 Pac. 67, by the circumstances that the questions there involved related to the unqualified guarantee in toto at the time of issuance of special improvement district bonds and in which no charter or statutory provision analogous to that under consideration here was involved.

 Since ordinances 87 and 88, Series of 1937, making the levy and appropriation respectively are not included in the record and the pleadings do not disclose in what manner or to what extent the proceeds from the levy are apportioned between the two classes of districts involved, we are unable to make further declaration on the subject.

And because of these circumstances, we do not determine the effect upon the whole levy of the possible invalidity of a part of it, but leave the parties to proceed as they may be advised in these matters.

The declaration of the trial court, as herein modified, is approved and the judgment, so modified, affirmed.

Mr. Chief Justice Burke and Mr. Justice Bakke concur.

Mr. Justice Hilliard specially concurring. In so far as affirmance of the judgment is ordered, I concur in the opinion of the court; but I am not in accord with the result otherwise.

Mr. Justice Bouck concurs in so much of this opinion as upholds the 1.409 mill levy in question; but he dissents in so far as the opinion denies the right and power of the City and County of Denver, as a home rule city, to advance its funds for paying unpaid balances of any of its public improvement bond issues in instances where the aggregate amount of special assessments theretofore paid happens not to have reached the full four-fifths of the particular issue and thus happens not to have reached the

point which makes the advancing compulsory. He also dissents in so far as the opinion declines to declare the law on certain clearly germane matters included among those pleaded in Denver's so-called third defense and counterclaim herein.

MR. JUSTICE YOUNG concurs in the opinion of the court in so far as it reverses the judgment of the district court and dissents in so far as it affirms it.

MR. JUSTICE HOLLAND concurs in the result of the opinion as to a reversal of part of the judgment and dissents as to other general results.

MR. JUSTICE BOUCK concurring in part and dissenting in part.

The opinion of the court apparently marks total forgetfulness of the fact that the City and County of Denver is a home rule city. Denver exists, not by grace of the state legislature, but in sovereign right as a direct creature of our state Constitution, effected by the adoption of article XX thereof in 1902, strengthened by the so-called Home Rule Amendment of 1912, and subject only to clear restrictions in the Constitution of the United States and the state of Colorado. By that article, as amended, the people of Colorado obviously intended to place the internal affairs of every home rule city in the hands of its own citizenry.

It was long supposed that thus the Constitution actually set Denver up as a municipality which, subject to the necessary police power of the state, would be independent and self-governing in all its local and municipal affairs, without hindrance from any outsider, even though that outsider be the executive or legislative branch of the state government, or any agency of the judiciary, whether it be this court or some other.

At different times in the past this court has given strong expression and support to the principle of municipal home rule thus established, but it has recently so

narrowed the practical operation of that principle as to threaten the principle's very existence. Compare *Denver v. Highlander Boy Foundation,* 102 Colo. 365, 79 P. (2d) 361. The case at bar caps the climax.

The main fallacy of the court's opinion is in failing to distinguish between obligatory and optional powers of Denver.

The opinion declares that under section 48 of its charter Denver *may* lawfully advance from its treasury the funds necessary to pay the unpaid balance of a bond issue if the proceeds from special assessments have paid four-fifths of the issue. The opinion therefore justifies as permissive what the charter clearly makes mandatory. However, it will be seen that said section 48, quoted in full by the opinion, says that the city "shall" pay in the circumstances mentioned. Nothing in the charter or elsewhere forbids the city's paying in other circumstances.

It is clear to my mind that Denver possesses this right.

By the 1912 Home Rule Amendment, which extended and enlarged the powers conferred in section 6 of article XX as originally adopted, the people of the entire state provided among other things that every home rule city should have, in addition to the powers set out in sections 1, 4 and 5 of the original article:

"All other powers necessary, requisite or proper for the government and administration of its local and municipal matters, including power to legislate upon, provide, regulate, conduct and control: * * *

"(e) The issuance, refunding and liquidation of all kinds of municipal obligations, including bonds and other obligations of park, water and local improvement districts; * * *

"(g) The assessment of property in such city or town for municipal taxation and the levy and collection of taxes thereon for municipal purposes and special assessments for local improvements; such assessments, levy and collection of taxes and special assessments to be made by

the municipal officials or by the county or state officials as may be provided by the charter.''

The charter has accordingly provided that these acts shall be performed by the municipal officials in so far as taxes and special assessments have to do with Denver's internal government and particularly all matters relating to its own local and municipal improvements. See article numbered III in the Denver Charter, Municipal Code 1927, pages 35-70, entitled Department of Improvements and Parks.

Given an issue of local improvement bonds in Denver, the bondholder has the *absolute right* to receive moneys derived from special assessments that are levied upon the property benefited. Section 48 of Charter, Municipal Code 1927, page 51. He cannot *demand* more, *except* that, where as much as four-fifths of the bond issue has been paid but the assessments are not sufficient to pay the balance, he can *demand* that the city pay that balance out of its treasury in accordance with section 48, just referred to.

If in a particular case, however, the shortage of revenues from assessments is for the time being so great that these have not paid as much as four-fifths of the issue, it is plain that the bondholder cannot *demand* that the general funds of the city be made to pay.

Must there, then, be what in such a case would amount practically to repudiation by failing to pay the bonds at maturity? I earnestly contend that, while the city cannot be compelled to pay, it is not forbidden to use sound discretion in applying its funds to payment of such an unpaid balance of more than one-fifth of the bond issue. Denver is of course reimbursed in that event by collecting the still unpaid assessments, just as in the case of the obligatory payment of the smaller balance of one-fifth or less.

Since the 1912 amendment is made expressly applicable to the City and County of Denver, the following provisions are in full force therein:

"It is the intention of this article to grant and confirm to the people of all municipalities coming within its provisions the full right of self-government in both local and municipal matters and the enumeration herein of certain powers shall not be construed to deny to such cities and towns, and to the people thereof, any right or power essential or proper to the full exercise of such right.

"The statutes of the state of Colorado, so far as applicable, shall continue to apply to such cities and towns, except in so far as superseded by the charters of such cities and towns or by ordinance passed pursuant to such charters.

"All provisions of the charters of the City and County of Denver and the cities of Pueblo, Colorado Springs and Grand Junction, as heretofore certified * * * are hereby ratified, affirmed and validated as of their date."

The matter of public improvement bonds, as well as all other fiscal matters of Denver, has been exhaustively dealt with in its charter. Hence, under article XX as amended in 1912 the General Assembly is deprived of all authority over Denver as a home rule city except that of exercising state-wide police power, not here involved.

The municipality has consequently replaced the General Assembly as the law-making body in respect to Denver's local and municipal concerns. In relation to those it possesses the same plenary powers of legislation which were originally possessed by the state legislature and is subject only to the same constitutional restrictions. Denver's legislature is a body operating not within limits of a grant, like the Congress, but in the entire field of local and municipal legislation and subject only to express constitutional restrictions.

No constitutional restrictions apply in the case at bar. There is no suggestion of entering into a contractual liability or obligation, by which the liability of somebody else is abolished or diminished, or is assumed by the city or in any way shifted. Existing liens and assessments

remain unaffected and those liens would eventually serve to reimburse the city treasury.

In short, Denver as a home rule city would simply be doing a business-like thing which tends to preserve municipal credit in connection with a purely local and municipal subject not within any constitutional inhibitions whatever. From what has been said it is obvious that *Aurora v. Krauss,* 99 Colo. 12, 59 P. (2d) 79, cited by counsel for plaintiff in error, is not in point under the facts of the case at bar, and the soundness of that decision need not now be considered.

Counsel for Denver also contend that the matters alleged in its third defense and counterclaim, mentioned in the opinion of the court, should be dealt with in the declaratory judgment. Some of those matters are manifestly germane to the ones dealt with in the opinion and should, as I think, also be included there. We ought not to require one homogeneous subject matter to be divided into two or more legal actions when one would suffice on any but the most technical grounds. The practical problems of the city should be solved in the most complete and comprehensive manner possible.

In so far as the opinion of the court sustains the tax levy and appropriation ordinances here involved I concur therein; but as to the other matters, for the reasons above given, I respectfully dissent.